## WILLIAM CLAYTON

*v.*

## GEORGE FEIG.

*Opinion filed February 17, 1899—Rehearing denied June 8, 1899.*

1. COLOR OF TITLE—*effect where grantor did not own all the land attempted to be conveyed.* A deed purporting on its face to convey title is good as color of title, although the grantor may not have owned all the land attempted to be conveyed.

2. EJECTMENT—*an outstanding title, to be available, must be present and subsisting.* An outstanding title, to be available as a defense to ejectment, must be present, subsisting and operative, and one which the holder might, as grantee, assert and recover possession from the plaintiff.

3. SAME—*objection that description is uncertain should be made at trial.* An objection that the description of land in a declaration in ejectment is indefinite and uncertain should be specifically pointed out in the trial court.

4. BOUNDARIES—*effect of commissioners' over-estimate of acreage in partition.* In the absence of any agreement or question of title by adverse possession, a shortage, resulting from the fact that the commissioners over-estimated the acreage of the tract to be partitioned, will not be allowed to fall upon one of the two tracts set off, but will be apportioned among both and the division line located accordingly.

5. SAME—*disputed or unascertained boundary may be located by parol agreement.* The boundary line between adjoining lands may be established by parol agreement of the owners where the boundary is in dispute or unascertained, and such agreement is binding upon the parties and those in privity, whether the period of limitation has run or not.

6. SAME—*agreement establishing boundary need not be express.* An agreement between owners of adjoining lands with reference to the location of the boundary line need not be express, but may be implied from their unequivocal acts and declarations and acquiescence therein for a considerable length of time.

APPEAL from the Circuit Court of St. Clair county; the Hon. M. W. SCHAEFER, Judge, presiding.

This is an appeal from a judgment in ejectment, rendered by the circuit court of St. Clair county in favor of

appellee, against appellant. The premises claimed by plaintiff are described in his declaration as a strip of land on the north side of lot 12, section 3, township 2, north, range 8, west, 32.34 chains long, forty-four feet wide at the east end and seven feet wide at the west end. He owns the south and the defendant a part of the north part of the south half of the north-west quarter of section 3, township 2, north, range 8, west, in St. Clair county. This litigation is the result of a dispute between them as to the location of the east and west division line between their lands.

Noah Sparks died seized of the south half of the north-west quarter of section 3, township 2, north, range 8, west, and in 1856, under a partition proceeding between his heirs, the tract was divided by commissioners, east and west, into two lots, the north one being designated in their report as lot 4, containing 50.53 acres, and the south one as lot 2, containing 43.52 acres. Lot 4 was set off to Margaret Sparks and lot 2 to Elizabeth Bevirt, daughters of Noah Sparks. The commissioners in their report failed to locate the ground line between the lots or designate it in any way, except by stating the number of acres in each lot as above. As a matter of fact there were but 85.91 acres in the tract, being 8.14 acres less than the commissioners estimated it to contain. Later an assessor made a plat of the tract, changing the number of lot 4 to 13 and that of lot 2 to 12, but this plat is identical with that of the commissioners except as to the numbers of the lots. March 18, 1864, Elizabeth Bevirt and husband conveyed the south lot to one Breig, it being recited in the deed that it was made to correct a conveyance between the same parties of date February 15, 1858. The description in the deed is: "The south half of the south half of the north-west quarter of section 3, town 2, north, range 8, west." Breig and wife conveyed by the same description to John Malter, March 19, 1864. John Malter and wife, on March 30, 1868, conveyed to John Feig, by the descrip-

tion, "43.52 acres off the south part of the south half of the north-west quarter of section 3," etc. On the 3d day of January, 1897, Feig and wife conveyed to plaintiff by the same description.

In the spring of 1859 Breig took possession of this lot and built a fence on the north line thereof, treating it as containing 43.52 acres, and from that time until 1878 he and his grantees continued to hold possession to that fence. As to the north lot, on August 29, 1877, Patrick Henry and wife, formerly Margaret Sparks, conveyed to defendant, William Clayton, a part thereof by this description: "Twenty acres off the east end of lot No. 4, to be so surveyed that the west line thereof shall run due north and south across said lot, the grantors excepting and reserving a strip of land thirty feet in width off the south side of the 20-acre tract above described, said strip to extend from the west side of said 20-acre tract to the center of the road, as now located, running from Collinsville to Belleville; said lot No. 4 being that part of the south half of the north-west quarter of section 3, township No. 2, north of range 8, west of the third principal meridian, allotted to Margaret S. Henry, grantor herein (then Margaret Sparks) and now one of the heirs-at-law of Noah Sparks, deceased, and so designated by plat of partition in suit of *Mary Sparks* v. *John M. Bevirt et al.*, recorded in book O," etc. Subsequently, on March 18, 1882, the same grantors conveyed to the same grantee another part thereof by this description: "All lot number four (4), said lot being that part of the south half of the north-west quarter of section number three (3), township number two (2), north, and range number eight (8), west of the third principal meridian, allotted to the said Margaret S. Henry as one of the children and heirs-at-law of Noah Sparks, deceased, and so designated on the plat of partition in suit of *Mary Jane Sparks* v. *John M. Bevirt et al.*, recorded in volume O, on pages 5, 6, 7 and 8, of the records of St. Clair county, Illinois, except therefrom two

(2) tracts heretofore conveyed by the grantors, to-wit: Ten acres off the west end of said lot, conveyed to the Sharpshooters' Society of Collinsville by deed recorded in volume No. 132, on page No. 371, of the records in the recorder's office of said St. Clair county, (all the coal under said ten acres, with the right to mine and use the same, being excepted and reserved in said deed,) and twenty (20) acres off the east end of said lot, conveyed to the said William Clayton by deed recorded in volume No. 144, on page No. 455, of said recorder's office,—a strip thirty (30) feet wide off the south side of said 20 acres, extending from its west side to center Belleville road, being excepted and reserved in said deed, leaving 20 acres, more or less, and said strip, and all the coal under said ten acres, as the real estate herein conveyed, situated in county of St. Clair, in the State of Illinois, hereby releasing and waiving all rights under and by virtue of the homestead exemption laws of this State."

In 1878, after he purchased the first 20 acres, Clayton had a survey of the land made, and built a new fence, placing it south of that built by Breig in 1859, on the line established by his survey, enclosing with his land the strip described in the declaration, and from that time until the present has remained in possession of the same.

Other facts necessary to be considered in the decision of the case are stated in the opinion.

JOHN B. HAY, and JOHN G. IRWIN, for appellant.

BARTHEL & FARMER, and W. E. TRAUTMANN, for appellee.

Mr. JUSTICE WILKIN delivered the opinion of the court:

It is first insisted that the plaintiff below failed to show title in himself. He bases his claim to the land, first, upon the assumption that by the partition proceeding Elizabeth Bevirt became the owner of 43.52 acres off

of the south side of the tract, and that by *mesne* conveyances from her he now owns the same. This claim ignores the fact that there proved to be a shortage in the whole tract, and if upheld would result in placing the entire loss of 8.14 acres upon the north lot. This, upon the plainest principles of justice, the law will not tolerate, but will apportion that loss between the lots and locate the dividing line accordingly. *Francois* v. *Maloney*, 56 Ill. 399; *Martz* v. *Williams*, 67 id. 306.

It is not denied that under this rule the true line between the lots is several feet south of the south line of the strip in question. It is therefore clear that plaintiff cannot deraign title to that strip from the partition proceedings. On the contrary, by that proceeding the title would be in the defendant. Plaintiff claims, however, that at the time the defendant took possession of it, John Feig, his grantor, had acquired a good title under section 6 of the Limitation act, (Starr & Curtis,—2d ed.—chap. 83,) and we think this position must be sustained. The deed from John Malter and wife to John Feig, dated, as we have seen, March 30, 1868, describes the land, not according to the plat in the partition suit, but as "forty-three $\frac{52}{100}$ acres off the south part of the south half of the north-west quarter of section No. 3, in township No. 2, north, range No. eight (8), west of the third principal meridian," which description includes the land in suit. It is not denied that his grantor was then in possession to the north line of the 43.52 acres, and that John Feig took possession of the land under his deed and continued to occupy it until 1878, when defendant built the new fence. The proof also shows that John Feig paid the taxes assessed on the whole 43.52 acres during his occupancy thereof, to the date of his conveyance to plaintiff.

It is insisted that as the deeds prior to this one from Malter and wife to John Feig refer to the plat and partition proceeding, and the latter deed is one in the chain of title, it should be limited in its effect by these deeds.

The law is otherwise. On its face this particular deed purports to convey title, and the fact that the grantor may not have owned all the land he attempted to convey will not invalidate the deed as color of title. *Nelson* v. *Davidson*, 160 Ill. 254.

We think plaintiff must be held to have shown title in himself under the statute above cited. As against that title appellant sets up the same statute of limitations, claiming color of title, adverse possession since the building of the new fence, in 1878, and payment of taxes. Without reference to the question of color of title and possession, this defense fails for want of proof of payment of taxes, which must, in such cases, be established by clear and convincing testimony. Two sets of tax receipts were introduced in evidence by the defendant, one set being receipts for taxes paid on lot 6 of the *north-east* quarter, etc., and the other set for taxes paid on lot 13 of the north-west quarter, etc. The first described land in a different quarter section from that in which the strip in question is located, while the other receipts only purport to show payments on 20.53 acres, without designating what lot 13 is intended, or in any way describing it so as to show that they cover any part of the lands described in the declaration. Nor does the verbal testimony offered add anything to the receipts in this regard.

Appellant also attempted to show an outstanding title in William Hadfield, William Fletcher and Matthew Needham in bar of the action. It appears that John Feig and wife conveyed to those parties all minerals and stone-coal underlying the land March 25, 1884. As to the strip in question it does not appear that the grantees in that deed ever took possession or that they now claim any ownership therein, and the evidence shows that the consideration has been refunded to and received by them in satisfaction of all interest conveyed to them. It is clear, under these facts, they could assert no right of possession

under that deed against the plaintiff, and therefore appellant could not avail himself of it in this suit as an outstanding title. An outstanding title which can be availed of by a defendant in ejectment to defeat the plaintiff's recovery must be a present, subsisting and operative title, —one under which the holder could himself, as grantee, assert and recover possession from the plaintiff.

It is insisted that the description in the declaration is incomplete and uncertain, and that the north line of lot 12 is indefinite, and that the calls for the land in dispute are tied thereto, and therefore they are also indefinite. The description in the declaration is double. The first reference is to the lot by number, viz., lot 12 of the south half of the north-west quarter, etc.; and the second description is, being 43.27 acres off the south side of the north-west quarter, etc. The strip in question is described by metes and bounds, as taken off the north side of the descriptions above. Adopting the second description and rejecting the lot number there is no variance between the declaration and the evidence. If lot 12 and 43.27 acres off the south side, etc., are not one and the same, and it is uncertain which description shall be taken, the objection should have been specifically pointed out on the trial. The defect could then have been easily remedied. (*Chicago and Alton Railroad Co.* v. *Clausen,* 173 Ill. 100, and authorities there cited.)

The most important question in this case is whether or not the line in dispute has been settled by the owners of the adjoining lands. It is clear from what has been shown above, that if the true line had been established between those owners, taking into consideration the shortage in the number of acres in the tract, the defendant would now be entitled to the possession of the strip in question. It is also clear that at the time he purchased his land and caused the survey to be made, in 1878, the true line between the lots had not been ascertained and determined. His contention is, that at the time he built

the fence in pursuance of that survey there was an agreement between himself and John Feig, who then owned the south lot, that the fence should be the dividing line between their lands, and also that by the acts of John Feig, and his subsequent acquiescence in the occupancy to that line, there was an implied agreement that the fence should be the line, which cannot now be controverted by the plaintiff. The law applicable to this branch of the case, deducible from the decisions of this court, may be stated thus: Where there is a dispute between adjoining owners of land as to the true boundary line, or that line is unascertained, they may establish it, first, by parol agreement and possession in pursuance thereof, and the line so agreed upon will be binding upon them and their privies in estate; second, such an agreement may be implied from the unequivocal acts and declarations of the parties and acquiescence for a considerable length of time; third, such an agreement, either express or implied, is enforceable both at law and in equity, whether the period of limitation has run or not; fourth, the line may be established by way of estoppel, without any agreement, when the parties have had undisturbed possession in conformity thereto for more than twenty years. There is no controversy in the present case as to the fact that as early as the spring of 1878,—eighteen or nineteen years prior to the beginning of this action,—appellant caused a survey of the land to be made and placed his fence in conformity therewith where it now stands, and that both parties have since occupied and used the land to that fence. Appellant testified, upon the trial, in substance, that at the time he built the fence John Feig consented to its being placed where it was, and assisted in locating the line and laying part of the worm of the fence; also, that he occupied his land to the line of that fence, making no objection to the appellant's possession until shortly prior to the bringing of this suit, when he conveyed to his son. In this he was corroborated by the

testimony of other witnesses, one of whom assisted in building the fence and seems to have been in no way related to the parties and entirely disinterested. John Feig testified that he did not assist in locating or building the fence, and denied that he either consented to its being built where it was or agreed to its location as the line. He also claimed in his testimony that he was at no time satisfied with that line, and in this is corroborated by the testimony of certain members of his family. Without expressing any opinion as to the weight of the testimony in regard to the contention of appellant that an agreement by implication existed between the parties as to the line in question, it must be conceded that the evidence on his behalf strongly tends to establish that fact, and that the most that can be said is, that the testimony in this particular is in irreconcilable conflict.

The giving and refusing of instructions is assigned for error, and we think, upon the question as to whether the line had been established by agreement, the court erred in instructions given on behalf of plaintiff to the prejudice of the defendant. The first instruction given on his behalf, after stating if the jury found certain facts as to the possession and payment of taxes by John Feig before the entry of the defendant, John Feig would have a good and perfect title which he could convey by deed, concludes as follows: "And if you further believe, from the evidence, that this grantee, the plaintiff in this case, (if you find that he is such grantee,) is now the owner of such title, then he can maintain an action of ejectment under such title, unless you believe, from the evidence, that the defendant has a later and superior title thereto." This instruction not only wholly ignores the defense as to an agreement locating the line, but in effect tells the jury that the plaintiff could recover notwithstanding such an agreement. In other words, it limits the defense to "a later and superior title" in the defendant. The second and third of the same series of instructions limit the same

defense to an express agreement at the time the fence was built. The language of the second is: "Unless you believe, from the evidence, that the boundary line in question was agreed upon by John Feig and William Clayton when the fence was built by Clayton, in 1878, or unless defendant has proven color of title and seven successive years' possession and payment of taxes upon the land in dispute." And the third, after placing the burden of proof upon the defendant to establish an agreement, directs the jury that "it is not to make an agreement for the parties, but to determine, from the evidence, whether there was an agreement by the owners of the land to establish the division line in dispute," and then says: "And you are further instructed that by an agreement is meant the meeting of the minds of the contracting parties on the same thing, so as to constitute a perfect understanding between them." The jury must have understood these instructions to mean, that unless there was an express contract,—"the meeting of the minds of the parties so as to constitute a perfect understanding,"—there was no such agreement as the defendant could avail himself of in this action. Such is not the law, as above shown.

The tenth instruction asked by the defendant was, that "even if the jury believe, from the evidence, that John Feig never expressly agreed to the line upon which the defendant built his fence, yet if they further believe that the defendant insisted on said line being ascertained by survey before he accepted a deed for the part of lot 4 which he then bought, and that a survey was made for that purpose and the line established where he built his fence in the spring of 1878, and that the said John Feig, with knowledge of said survey and the purpose of making it, without protest or resistance permitted the defendant to build his fence on the line of said survey, and afterwards built and maintained his part of said partition fence on said line, and as long as he owned said lot 2 acquiesced in the claim of the defendant that said fence

was on the true line between said lots, and that the defendant had possession of the strip of land in controversy when the said John Feig conveyed to the plaintiff, then you will find the defendant not guilty." This instruction was refused, and so modified as to entitle the defendant to a verdict of not guilty only upon condition that he had possession of the land for more than seven years before the commencement of the suit, and during that time had paid all taxes thereon, and that he had and claimed color of title thereto in good faith before and during the said seven years. While the instruction as asked was too broad in requiring the jury to return a verdict of not guilty upon the facts stated, these facts being only proper to be considered by the jury in determining whether there was an implied agreement or not, in view of the instructions given on behalf of the plaintiff this instruction, with the slight modification indicated, should have been given. At least by some direction to the jury defendant should have been given the benefit of the testimony introduced by him, tending to show that by his declarations and acts, together with the many years of acquiescence, John Feig had agreed to the line insisted upon.

The third instruction given on behalf of the plaintiff was unfair to the defendant in the further particular that it calls especial attention to the fact that John Feig and the plaintiff, George Feig, denied that they, or either of them, agreed upon said division line, giving undue prominence to the fact that they made such denial.

In view of the facts of the case we are of the opinion that there is such error in the instructions given to the jury as must work a reversal of the judgment below and a remandment of the cause for another trial.

*Reversed and remanded.*